ARCHIBALD CALDWELL, *Administrator of* JANE RENFREW'S ESTATE *v.* JOHN RENFREW.

*Husband and Wife. Separate property of wife. Donatio causa mortis. Promissory notes.*

Where both husband and wife have always treated as the latter's separate property, and as under her entire control, money and notes taken for the loan of money, belonging to her before, or accruing to her during coverture, her right to hold and dispose of the same as she may choose, will be recognized and protected by courts of law as well as of equity.

She may, therefore, make such notes the subject of a *donatio causa mortis* to her husband as trustee for other persons, and even though the husband do not reduce them to possession during her life, the delivery of them to him by her for such purpose, will vest in him a good legal title to them as against her administrator.

*It seems* that the husband himself may be the donee *causa mortis* of such notes in his own right.—BARRETT, J.

TROVER for five promissory notes, one for one hundred and fifty dollars, signed by Archibald Caldwell; one for fifty dollars signed by James Caldwell; one for forty-five dollars, signed by Robert Gray; one for fifty dollars against John Doe, and one for fifty dollars signed by Orrin Heath. The notes signed by Archibald Caldwell, and James Caldwell were payable to Jane Renfrew, or bearer, and the other notes were payable to Jane Renfrew. Plea the general issue, and trial by jury at the June Term, 1860,—ALDIS, J., presiding.

It was admitted that Jane Renfrew was the second wife of James Caldwell, and that the plaintiff was her son and sole heir. James Caldwell by his first wife had children—James, William, John and Jane Miller and one or two others—whose names are mentioned in the paper hereafter described of the date of September 26, 1857. Upon the decease of James Caldwell, his widow, (afterwards Jane Renfrew,) by his will received from his estate in notes, cash and personal property a larger amount than the sum of the five notes sued for.

In 1842 she married the defendant, John Renfrew, and at the time of the marriage had divers notes and some cash, and other personal property. Neither before nor at the time of this mar-

riage was there any agreement between her and the defendant as to her property; but always after the marriage and up to the 26th of September, 1857, by his entire consent and approbation she kept her notes and money separate from his and wholly in her own custody and subject to her control. She kept her notes and money in a chest she had received from her former husband ; the chest was locked and she kept the key herself. This was done with the full consent of the defendant, who intended she should have such separate control of her property and a right to the final disposition of it. The notes she owned at her marriage with the defendant had been collected two or three times, and the money re-loaned, the new notes being taken by and made payable to her. Frequently she collected the money and loaned it again, and took the notes, doing all the business herself. Her husband often collected money on her notes for her and wrote notes for her, but he always delivered the money he so collected (with perhaps some trifling exceptions,) into her hands, and wrote the notes payable to her, and delivered them to her.

On the 25th of September, 1857, she was very sick, and in expectation of death. It appeared by the testimony of the defendant, which was admitted, notwithstanding the objection of the defendant, that on the 26th of September, having slightly revived, she requested him to get her notes ; that he did so, and looked them over ; that she told him she wished him to receive the notes in question and to give to the children of her former husband, and to her brother certain sums ; that he agreed to do so, and at her request drew up at her dictation, and signed the following paper :

"NEWBURY, Sept. 26, 1857.

This is to certify that in consequence of certain notes given unto me by my wife," (describing the notes in question,) "I agree to pay James Caldwell forty dollars, John Caldwell twenty dollars, William Caldwell forty dollars, Jane Miller forty dollars, Christian Orr fifty dollars, Nancy Holmes forty dollars, Archibald Caldwell seventy-five dollars, and John Craig ten dollars, to be paid in three months after the decease of my wife ;"

that after signing the paper he read it to her and then replaced the notes in the chest ; that as he, the defendant, understood it,

after that date the notes were his property and he was to pay the persons named in such paper the sums therein mentioned ; that she, Jane Renfrew, continued sick until August 28th, 1858, when she died, until which time, during a most painful sickness, he took almost the entire care of her ; that in the spring of 1858, he took the notes from the chest where they had previously been kept and put them in his own pocket book, where he kept them among his own papers, and he told her that he had taken them ; that he tried to collect one of them, but collected nothing upon them till after his wife's death ; that on the -9th of June 1858, his wife requested him to write a foot note to the paper dated Sept. 26th, 1857, above recited, which he accordingly did at her dictation, and she signed it by making her mark, having then lost the use of her hand. It was as follows : "This is to certify that in conse- quence of my long and sore sickness, I give unto my husband one-third part of the above payment."

There was nothing in the case to show that the disposition of the notes by her on the 26th of September, 1857, and 29th June, 1858, was other than the free and voluntary exercise of her judg- ment and will, and without any undue influence by her husband.

The plaintiff, before taking out letters of administration upon his mother's estate, demanded the notes of the defendant, as being the sole heir of his mother, and after administration was granted he demanded them as her administrator. On both occa- sions the defendant refused to give them up, claiming to own them, subject to the provisions of the paper of September 26, 1857, and the foot-note thereto. The defendant, within a week after his wife's death, paid to Craig, (an aged brother of his wife, whose name is mentioned in the paper,) seven dollars of the sum specified. This was before any demand was made by the plaintiff for the notes.

The counsel for the plaintiff insisted that inasmuch as the defendant had never in the lifetime of the wife reduced the notes to possession by collecting the money, or by negotiating them for money, he had no right to withhold them from the plain- tiff and was liable therefor in this action, and requested the court so to charge the jury.

The court declined so to charge, but did charge the jury that if Mrs. Renfrew gave the notes to her husband to be his property,

but subject to the condition of the papers of September 26, 1857, and June 29, 1858, and he took them into his actual custody, possession and control, during her life and with her consent, and so kept them till her death, holding and claiming them as his own property, but subject to the conditions of those papers, then they became his property, and that this action would not lie, although he did not collect any of them till after her death.

To the admission of the testimony objected to, and to the refusal to charge as requested and to that part of the charge above stated, the plaintiff excepted.

*A. Underwood* and *Leslie & Rodgers,* for the plaintiff.

*David T. Corbin* and *C. C. Dewey,* for the defendant.

BARRETT, J. In the case of *Curtis* v. *Hapgood and trustee,* in Windsor county, February Term, 1859, it was decided on full consideration, after two arguments, that the wife's right would be protected at law against the creditors of the husband, in respect to money loaned and notes taken to herself, under a similar arrangement between herself and her husband to that which appears to have existed in the present case.

In *Richardson, Adm'r* v. *Estate of Merrill et al.,* 32 Vt. 27, upon a similar state of facts, it was held that the wife would hold the notes taken for money loaned as against the heirs of the husband, deceased. After these two decisions, it may be assumed that the wife has a valid title, which courts of law will regard and give effect to the money and the notes taken therefor, under an arrangement between herself and husband, that such money and notes are to be held by her as her separate and individual property.

In the two cases referred to, much of the money accrued to the wife, and the loans thereof were made from time to time, during coverture; and in the latter of said cases, much of the business of loaning the money and taking the notes and securities was done by the husband for and in behalf of the wife, such notes and securities being taken in many instances in the name of the husband, for the convenience of making collections.

In the present case, therefore, the only open question is,

whether the wife had the legal ability to make such a disposition of the notes in question and of the money embraced in them, as she undertook to make in this instance. In other words, did the husband acquire such a right to the notes as entitles him to hold them against the other heirs of the wife, for in this case the right to the possession of the notes themselves is the hinge point of the case.

It being assumed that the wife was the owner, in her own right, of the money and notes in question, in the eye of the law, it would seem to follow as a legitimate and logical result, that she was invested with all the incidental rights of such ownership, so far at least as it was not in contravention of any asserted rights of the husband. It is necessarily involved in such ownership in this case, as it is made up, that she had the power to loan, to col-lect and reloan, and to enjoy all the rights incident to and flowing from her exercise of such power. Could she not have given to any of her debtors the debt evidenced by any of the notes she held? Could she not have given any portion of the money to any one she saw fit, instead of re-loaning and taking notes for it? It was early held in England that there were instances where the wife had the actual ownership of property, distinct from her husband, so that it was out of his reach; as where on marriage, the husband endowed the wife, *ad ostium ecclesiæ*, with personal goods in lieu of dower in lands, the property became hers in such a manner that it was not in his power to claim it; and it being her own, she might devise it; and in later times it has become common learning in the English courts. In 2 Ves. 190, Ld. HARDWICK recognizes the doctrine that a married woman may dispose of her personal estate by any act in her life time or by will. And Ld. THURLOW said in 1 Ves. 103, that it is impossible to say that a married woman is incompetent to act with her separate property as a *feme sole.*

Whatever may have been the idea formerly as to the necessity of administering the rights of the wife in her separate property through a court of equity, it must follow as a necessary conse-quence of her legal title, recognized and protected in the courts of law, that courts of law recognize and give effect to those acts, by her voluntarily done, which affect that title.

In this case, we feel obliged to regard the acts of Jane Renfrew, in making disposition of her notes, in just the light in which they were viewed by the parties to that disposition. In the immediate apprehension of death she transferred those notes to her husband for the purpose, through him, of having their avails go after her decease to certain persons named. Subsequently while yet lingering in the expectation of death, she varied her disposition of them by directing a portion of the avails to be retained by her husband. He held the notes under that disposition up to the time of her death, and continues to hold them for the purpose of carrying out her disposition of them. If she was legally competent to make that disposition, in any part, for the purpose specified, then, as matter of course, the legal title was vested in her husband, in order to the accomplishment of such purpose.

It cannot be doubted that she might make a *donatio causa mortis* to the persons named, through the intervention of a trustee, nor can there be any doubt that her husband might be such trustee. So far as the relatives named in the instrument of September 26, 1857, are concerned, we think it was her clear intention to make a *donatio causa mortis*, and that the transaction embodies all the elements that the law requires in order to constitute such a gift. This being so, it would seem that the legal title became vested in her husband, so that he might hold the subject matter of the gift as against every body, and especially as against those whose right, if any they had, must be subsidiary to that of the donors of the gift. In this view alone, it seems to be needless to discuss whether the husband could be a *donee causa mortis* of the wife ; and yet on principle it is quite difficult to assign a cogent or plausible reason why he might not be

The discussion has proceeded thus far on the assumption that the notes against third persons may be the subject of such a disposition as was undertaken to be made in this case. It is well settled in this State that the note of the donor to the donee cannot become such a gift, it being a mere promise to pay. In *Holley* v. *Adams*, 16 Vt. 206, this subject is thoroughly examined and discussed by Judge HEBARD ; and in the opinion delivered by him in that case, he incidentally discusses the other question,

viz: Whether the note of a third person can be the subject of a gift *causa mortis*? He expresses a clear opinion that it may be. In a similar case, 21 Vt. 235, Judge POLAND, in a most elaborate discussion of the subject of gifts *causa mortis*, regards that to be the true doctrine, both upon principle and authority. *Contant* v. *Schuyler et al.*, 3 Paige, Ch. 316, is a direct authority, with which we are entirely satisfied. If we were to treat this question as *res integra* in this State, we should not hesitate thus to decide the law on this subject.

The view which we thus take of the case renders it useless to examine or discuss the questions made in the argument, as to what is necessary in order for a husband to reduce the wife's *choses in action* to possession, for we permit the case to stand upon the assumption of the counsel for the plaintiff, viz: that the husband had not reduced them to possession in such a mode and sense as to entitle him to hold the notes on that ground. We put his right to hold them entirely on the ground of the wife's act in disposing of them, and that in virtue thereof, he is invested with the title, in subserviency to the purposes for which she made the disposition. This view also renders it needless to consider the questions made as to the admissibility of the evidence that was objected to.

On the whole, we are unanimous in affirming the judgment of the county court.