JAMES TILLINGHAST, Administrator, v. JAMES WHEATON, Executor.

The delivery of a savings bank pass-book containing the entries by the officers of the bank of the moneys deposited by a deceased wife, with a parol gift of the same by surviving husband when in extremis, is a valid *donatio causa mortis* of the money deposited in the bank.

THIS was a bill brought by the administrator of Sarah Crocker, setting forth that one of her sisters claimed certain money deposited in a savings bank as a *donatio causa mortis* to them. That the other next of kin, and the administrator of the hus-

band, also claimed the money, and asking the instruction of the court. The facts are fully stated in the opinion of the court.

The cause was argued by *James T̃illinghast* for sisters claiming the gift, and by *John P. Knowles*, *contra.* The only brief filed was by *James Tillinghast*, as follows

Upon the decease of Mrs. Crocker, intestate, this deposit vested in said John Crocker as her surviving husband.

1. Under the English Statutes, the husband's right to his deceased wife's personal property has been settled from the earliest times; and it does not at all depend upon his taking administration. His taking administration at all is merely ancillary to his asserting his right to the property. If he can get in the property without administration, his title to it is as perfect and complete as though it were got in through administration. He may, even in equity, on proving his wife left no debts, sue for and recover her property without administration; and if administration is committed to any other person, it is solely for the benefit of the husband and as his trustee. 1 Williams on Executors, 741, &c.; *Humphreys, administrator,* v. *Bullen and wife, administratrix,* 1 Atkins, 458; 2 Williams on Executors, 1276–7; *Elliot* v. *Collier,* 3 Atkins, 526, same case; 1 Wils, 168, 1 Ves. (Senior) 15; *Watt* v. Watt, 3 Vesey, Jr., 244; *Molony* v. *Kennedy,* 10 Simons, 254. And so in this country where similar statutes exist. *Stewart* v. *Stewart,* 7 Johns' Chancery, 243; *Whitaker* v. *Whitaker,* 6 Johns' Rep. 119; *Hudson* v. *Wallace,* 1 Rich. Eq. (So. Car.) 1. See p. 23. This was so before the English Statutes of Distributions, (22–23 Car. II, Chap. 10), and that statute did not change it. The husband is not mentioned in it, and is not within its equity. The explanatory section thrown into the Statute of Frauds (29 Car. II, Chap. 3, § 25) was merely from abundant caution. 1 Williams on Executors, 336, &c.; 2 Williams on Executors, 1276, &c.; per Lord Hardwick, in *Humphrey* v. *Bullen and wife,* 1 Atkins, 458; and in *Elliot* v. *Collier,* 1 Wils. 168, same case, 1 Vesey, 15; per Lord Loughborough, in *Walt* v. *Walt,* 3 Vesey, 247.

2. Unless, therefore, some radical difference can be pointed out between our statutes and the statutes of England and these

other States, the question involved in this case has long since been concluded by the highest judicial authority. Now, so far from there being any such radical difference in our statute, it is, substantially, indeed, almost literally, a reënactment of the English statutes. Our statute of distributions (Rev. Stat. Chap. 159, § 9. p. 373) is an almost literal transcript from the statute, (22 and 23, Car. II, Chap. 10,) and must be construed in connection with section 7 of chapter 156, (Rev. Stat. p. 361,) which is almost a verbatim reënactment of the explanatory section of the Statute of Frauds (29 Car. II, Chap. 3, § 25.) And that it was so intended is particularly apparent, from a comparison of this section 7, where it first appeared as section 13 in the act on page 297 of the Digest of 1798, and continued in the same connection and language down to and through the Digest of 1844, (preceded as it is by sections regulating the grant of administration upon, and the distribution of, intestate estates,) with that section of the Statute of Frauds as cited in 2 Williams on Executors, 1276. By simply changing the connection and location of this section, and therefore omitting the concluding clause,—"anything in this act to the contrary notwithstanding,"—the Revisers of the Digest of 1857, or the General Assembly, could not have intended to radically change the law, as any such intention would have been plainly expressed. And compare section 13 of chapter 153, (Rev. Stat. p. 363.)

3. But if this is not so, then the explanatory section of the English Statutes of Frauds is still in force in this State. It was expressly introduced by the act of 1750, included in the Digest of 1767, page 56, and has been expressly kept in force through all succeeding revisions to the present time. See Rev. Stat. Chap. 245, § 3, p. 632.

4. Any other construction of the statute would make the husband's rights dependent upon the mere accident of his surviving his wife sufficiently long, or being competent or able mentally or otherwise, to take or obtain administration, which never could have been intended.

These respondents claim this deposit by gift from John Crocker.

1. The bank deposit, or pass-book, represents the deposit itself; is the evidence of the indebtedness of the bank to the depositor, as much so as the bond or note of a corporation or individual. It is made so (if indeed it would not be so otherwise) by the *express provision* of the *act of incorporation* of the bank, which provides, in article 4th of section 5, as follows: " An account shall be given in a book to each depositor, by the treasurer, of the sum deposited, *which shall be the evidence of the depositor's property in said corporation."*

2. It is now fully settled, (whatever doubts may have been formerly entertained respecting it,) that not only negotiable notes, bonds, &c., of a third person, which are payable to bearer, or can pass by delivery, but also such as are " not negotiable so as to pass by delivery, and also promissory notes not negotiable, bonds, mortgages, policies of insurance, and *all other evidences of indebtedness which may be regarded as representing the debt,* may be a parol gift, and the delivery of the paper by which the debt is evidenced, either with or without a written assignment or endorsement," constitute a valid gift *inter vivos,* or *mortis causa,* the donee having the right to use the name of the executor or administrator of the donor to collect them. 2 Redfield, § 42, ¶ 5 (9), pp. 312–13, and ¶ 6, p. 317, *et passim*; *Duffield* v. *Elwes,* 1 Bligh, N. S. 497, same case 1 Dow & Clark, 1; *Parish* v. *Stone,* 14, Pick. 198 (per Shaw, C. J. 204–5–6); *Grover, administrator,* v. *Grover,* 24 Pick. 261.

The opinion of the court was read by DURFEE, J. The bill is brought to determine who is entitled to a sum of money on deposit in the Providence Institution for Savings in the name of Sarah Crocker, who died August 5, 1865, leaving a husband who died August 20, 1865, without having taken out letters of administration on her estate. The money is claimed by the brother and sisters of Sarah Crocker, as her next of kin; by James Wheaton, as executor of the last will of John Crocker, and also by Abby Ashton and Jane K. Carpenter, two of the sisters of Sarah Crocker, by virtue of an alleged gift *mortis causa* from Sarah Crocker, or from John Crocker after her decease, and agreeably to her request. The last named is the

claim which has been mainly contested, it being virtually conceded, that as between the next of kin of Sarah Crocker, claiming as such, and the executor of John Crocker, the executor has the better right.

Sarah Crocker at her decease, held, as evidence of the amount due her from the bank, a book in which her account with the bank was stated by its officers; and it is claimed that the gift was made by a delivery of this book, with words of gift, to Abby Ashton, by John Crocker, into whose hands the book had come, after his wife's decease, accompanied by a letter from her requesting him to divide it equally between Abby and Jane after he had done with it.

In proof of this allegation, William T. Luther was called as a witness and testified, that he was with John Crocker during his last illness and took care of him; that said Crocker was sick a week or ten days after his wife's decease; that a day or two before he died he saw him give to Mrs. Ashton a book similar to the bank-book which was exhibited to the witness, (being the book formerly belonging to Mrs. Crocker,) and heard him tell her to take it, keep it, and take care of it, it was hers. The witness could only say the book given was like the book exhibited to him, not that it was the same. In regard to the note alleged to have been written by Mrs. Crocker, the witness only knew there was a note found in her drawer after she died, and that it was given to Mr. Crocker; the next morning he asked Mr. Crocker if he had read it; Crocker said he had, it was sacred, that anything Sally said, should be done,—meaning his wife. The witness also testified that Mr. Crocker had considerable gold and silver in the house which he wanted Mr. Wheaton to dispose of; that Wheaton took the gold and took a bank-book with him; that Wheaton returned and again went away; and that it was two or three hours subsequently that Mr. Crocker gave the bank-book to Mrs. Ashton. Wheaton testified, as to the alleged letter to Mrs. Crocker which was shown him, that there was a letter from Mrs. Crocker of a similar import, but he thought not the same as the one shown him, though he was not sure; and as to the bank-book, that Mr.

Crocker handed it to him, and that at his request he carried it to the bank to have it transferred to Mrs. Ashton and Mrs. Carpenter; that the bank declined to make the transfer, and he probably returned the book to Mr. Crocker, the witness being old and his recollection indistinct.

Such is the substance of the testimony, and, being uncontradicted, we think it proves that the book delivered to Mrs. Ashton is the book which belonged formerly to Mrs. Crocker, and that it was given by Mr. Crocker in contemplation of death, and for the purpose of transferring to the donee the money in bank of which it is the evidence. Such being our conclusion, the question is, whether, under the law relating to gifts *mortis causa*, the gift by simple delivery of a bank-book, which in itself is nothing more than the non-negotiable evidence or certificate of the deposit and its increment, can operate as a gift of the deposit and its increment.

It has been uniformly held, that bank notes, notes payable to bearer, and other securities and evidence of indebtment, which are transferable by mere delivery, may pass as gifts *mortis causa;* but in *Miller* v. *Miller*, 3 P. Wms. 356, it was decided that a note of hand, not payable to bearer, and being a mere chose in action to be sued in the name of the executor, was not the subject of a *donatio causa mortis*. In *Ward* v. *Turner*, 2 Ves. Sen. 431, it was held by Lord Hardwicke, that a gift of receipts for South Sea Annuities was not a good *donatio causa mortis*, principally because the property did not pass by a delivery of the receipts, but a transfer was necessary, which was not made. The doctrine of these decisions has been recognized and approved in other English and in some American cases. *Tate* v. *Hilbert*, 2 Ves. Jr., 110; *Pennington* v. *Gittings*, 2 Gill & J. 208; *Bradley* v. *Hunt*, 5 Gill & J. 54; *Overton* v. *Sawyer*, 7 Jones' Law (N. C.) R. 6. But in the more recent English decisions, the strictness of the ancient rule has been much relaxed, and it is stated by Mr. Redfield, who seems to have had access to all the later cases, that it is now fully settled in the English courts, that not only are all securities which pass by delivery or by endorsement, when endorsed in blank, the subjects for a

valid gift *mortis causa*, but that " even promissory notes and bills not negotiated so as to pass by delivery, and also promissory notes not negotiable, bonds, mortgages, policies of insurance, and all other evidences of indebtedness which may be regarded as representing the debt, may, by a parol gift, and the delivery of the paper by which the debt is evidenced, either with or without written assignment or endorsement, constitute a good gift *mortis causa*." 2 Redfield on Wills, pp. 312, 313, and cases there cited. The rule thus educed from the English authorities has been repeatedly recognized and applied by the American courts. *Brown* v. *Brown*, 18 Conn. 410; *Waring* v. *Edmonds*, 11 Md. 424; *Parish* v. *Stone*, 14 Pick. 198; *Turpin* v. *Thompson*, 2 Met. (Ky.) R. 420; *Lee* v. *Boak*, 11 Gratt. (Va.) 182; *Caldwell* v. *Renfraw*, 33 Vt. 213; and see *Westerlo* v. *De Witt.* 35 Barb. 215. It is true we find no case which is the exact parallel of the case before us, but the principle declared in the cases to which we have referred is broad enough to include the case before us; and therefore whatever, as a matter of wise policy, we may think of the expediency of holding a Savings Bank book to be the subject of a gift *mortis causa*, we do not see how, as a matter of law, we can hold otherwise. We think the gift a valid gift, and that the donor is entitled to have it perfected, if need be, by the legal representatives of Mr. or Mrs. Crocker.

The answer of Mrs. Ashton and Mrs. Carpenter sets up a claim to the deposit and its increment by virtue of a gift *mortis causa* to them jointly. The evidence shows a gift to Mrs. Ashton alone. There must, therefore, be some amendment of the allegation to correspond with the evidence; or the decree, if entered in favor of both the sisters, must be entered by consent.